and Robert Wade. I understand Mr. Wade's case is on submission. Is that right? And that we have counsel for Mr. Christopher present. Do I have that right? That's correct. Very good. So, again, make yourselves at home on the podium. And let's just make sure that back door closes all the way. It was sort of rattling a bit a second ago. Let's just wait. I don't trust the door closer. I hear they slam. Yeah, we'll tell you when it's clear. Again, we don't want to be... Okay, we're good to go. Why don't you proceed, Mr. Healy. May it please the Court. Good afternoon, Your Honor. I'm James Healy, and I represent appellant Darius Christopher. I was part of the trial team in the underlying case. As defense lawyers, we're called on to represent our clients vigorously. And in the trial condate, our mandate is to try to win, of course, within the law and within the ethical rules. The Supreme Court, however, put a finer point on the restrictions to the government in their interest, saying, quote, in a criminal prosecution, it is not that it shall win a case, but that justice shall be done, end quote. In this case, justice was not done. To be sure, this appeal does involve issues specific to Mr. Christopher, and it's our position that the lower court abused its discretion in determining evidentiary issues, simply ratifying the government's positions. And the lower court erred in its jury decision charges and its application of the obstruction of justice enhancement. But in this Court's ultimate determination, there are issues that will have far-reaching ramifications on prosecution and defense. Specifically, first, the lower court allowed a so-called gang expert to identify to testify in this case where the charge of conduct had no evidentiary connection to the gang testimony other than the gang testimony. Secondly, the lower court refused to allow Mr. I'm sorry. Say that again? It was not relevant except to what he testified? No. In other words, the only connection to gang activity, the only evidentiary connection to gang activity was the gang expert's testimony. Well, no. There were the messages from the defendants, right, using all those terms like Ewoks. This was not a Star Wars case, right? Not to my knowledge. But it showed that the defendants, and I can't remember which one, were using terms in a peculiar way that was outside the common knowledge of the jurors to show that they were using gang terminology. And because the overall theory of the case is that this was a gang retribution case. So I guess I'm not sure why. Well, Your Honor. You're saying it's completely self-referential, but it's not. It's tying into the actual messages that these defendants were sending. So there were So it's not completely. It's not a closed universe. Respectfully, Your Honor, I think, as does the government's brief and the government's theory of their prosecution, I think it overstates the reality. The reality was that there were tens of thousands, tens of thousands of social media postings and messages that were recovered from these two defendants. At trial, there were literally a handful. It's a great jury argument, right? To say, look, the government's cherry-picked. Let me show you all these other ones. This is, they've misrepresented the messages, right? In addition, Your Honor, those handful of messages, as interpreted by the, quote, You think the jurors thought that Ewok is not a Star Wars term? I think the jurors were given an imprimatur of reliability by the judge to this expert. But I thought you just said that he testified without certainty. So how is the, you seem to be arguing two things, that the expert got up there because he said something, the jury was brainwashed. On the other hand, you're saying that the expert did not testify with absolute certainty, meaning he didn't tell the jury that this absolutely always meant something. So I don't know how to hold both thoughts in my head at the same time. And I'll expound on it, Your Honor. The judge tried very hard. Well, I won't say that. The judge set certain restrictions on what testimony he would allow the gang expert to testify to. Phrases, hand signals, that should be it. The gang expert took that handful of signals and gave an opinion. And the opinion was equivocal. It's in our brief. It's in the record. This could mean that. Do other people use these terms? Yes. So how is that a problem for you? It's a problem because then he exceeded the bounds of what he was allowed to testify to, talking about urban slang, allowed to talk about I thought you said words were okay. Gang terms. Not words. Gang terms. And that's what the, I can read the judge's Well, wait, wait, wait. So you're saying that the judge said, okay, he can talk about gang terms. And the witness said not just this message reflects a gang term, but that message reflects urban slang that I know something about. And was there an objection then at that point that said he can't say that? There were That's not gang terms. That's urban slang. There were objections both in what he would be allowed to testify to and there were contemporaneous objections that were made during the course of the trial. And the judge said, no, that's okay. Correct. So why are we to say, I mean, I can, I understand the argument that this would be impermissible expert testimony, that an expert can't testify about urban slang or But I'm not sure how you can say that the, we should reverse because the witness said something that violated the judge's ruling when the judge ruled it was okay. The judge may have been wrong to say it was okay, but it's not a question of exceeding what the judge said was proper. The judge said this was proper and that's either right or wrong. The judge allowed the witness to testify over objection. We contend that was an abuse of discretion. The judge then set parameters. During the course of the trial, when the witness was allowed to testify beyond those parameters and objections were made, the judge then erred a second time in not sustaining the objection. But the reason that the objection should have been sustained, it seems to me, has to be that it was improper expert testimony, full stop. Not, that's not what I thought I was allowing, right? Because the judge, what the judge thought he was allowing is what the judge allowed. So that's either not allowable, that's fine. You want to argue that the expert was not qualified to or did not testify accurately or that urban slang is not a fit subject for expert testimony or any of that. But I just don't see how you're sort of tying, you're saying we should reverse because the expert did something that may or may not be impermissible, but that violated what the judge had previously said when the judge is now expanding his ruling. Rulings change over the course of the trial. So the question is, what's wrong with the witness testifying to urban slang? What's wrong with it is it made the entire case as actually Judge Zanardi framed it, as the judge framed it in sentencing, as it was framed to the jury, that this was a gang retaliation shooting. The only evidence of that came both from a gang expert and impermissible testimony by the judge. Can I then go back to the closed loop thing that you started out with and Judge Zanardini asked you some questions about it. Do I understand the argument to be that this case is unusual, now whether it's okay or not is a different question, but it's unusual at least in that you have two elements. One is the defendants. They have this evidence in the record from the expert that would identify them with a gang. Then you have a victim, and there is evidence in the record which comes from the same expert that he, well, not that he was affiliated with a gang, but that he said something that would be taken as disrespectful to gangs. Absolutely. So that it's not a case, for example, where you have a guy walking down the street with a jacket that says Crips on the back, and then you have somebody else who shoots him, and the gang expert says that somebody else is linked to the bloods, and here's what's in his social media that shows that. It's that there's no Crips jacket and there's no bloods jacket. There is evidence perhaps that directly ties the shooters to a subset of the bloods, and then it's a somewhat more loose suggestion that one of the three people who got shot was not even affiliated with a particular gang, but dissed anonymous gangs. And that, you think, is what? Not insufficient? You're not making a sufficiency of the evidence claim, though, are you? I don't think it's insufficiency of the evidence. It was an abuse of discretion to allow the gang expert to testify to the jury that this individual, as you so rightly say, no evidence that he's tied to any gang. Well, but there is evidence that he is memorializing someone who was killed on the street, and that he says things, which there is an argument, which seems to me a jury argument, that he's just singing along with a rap song, but he chose the song, I take it, and he is parroting where he says things that diss gangs, and I guess the one thing that I think I would have to give you on this is it's not what he says specifically references the gangs to which Mr. Christopher, the gang to which Mr. Christopher is linked. Yes, and, Your Honor, I do want to just clarify, and it is, it's only in the record in a limited fashion, but Detective Tolan is questioned about Smelly. Smelly is the nickname of the young man who there's a memorial on.  Smelly was killed in a stabbing over the theft of a bicycle that Detective Tolan testifies to. The name of the song, No Escape, which the gang expert who testified for pages about what that song means had never heard it, had never heard of Lil' TJ, and they did not have a copy of the lyrics. He listened to it twice. He was asked, do you know that Smelly was a friend of Lil' TJ's, that this song is about Lil' TJ's? Mark Orliana, the individual who was wounded, who is singing along to No Escape, was a friend of Smelly's, that the jury was given the impression by the gang expert that this is a gang diss, had no basis other than his own statement, and when, and by the way, when asked about his own statement, his own statement is testimony about what Orliana said that afternoon, and Orliana says something about fuck the ops, right? That's correct, and that's in the song, Your Honor. It's in the song, okay, fair enough, but he says that, and then he says at the end, And lo and behold, he is here, hours later, taking his stand on that street corner, and meanwhile, there are people who, I think you are agreeing, because you're not challenging the sufficiency of the evidence, that a jury could reasonably have found beyond a reasonable doubt were who rendezvous in advance, come to this place, and shoot randomly into a crowd, that would seem odd based on that behavior, they were there for a reason, and Orliana just happens to be one of the people who gets killed, because he's standing there saying something nasty about gangs, and then defiantly saying, I'm here. Now, I'm not here to say, if I'm a juror, I believe beyond a reasonable doubt that that's what this story is all about, but I'm not sure I understand why there is anything inadmissible about the evidence that I just recounted. The question, it seems to me, is, well, what does that prove? The jury decided it proves this, and you're not saying it couldn't. Well, Your Honor, respectfully, it's not whether it's admissible, it's whether it's more prejudicial than probative. When a gang expert gets up there and says, and again, I push back on this, there were 12 people on that street corner. Three were wounded. Detective Tolan only found social media from one of them. So he runs with that. Here's a guy singing along to a rap song that has terms in it that are used in dozens of rap songs, not just by gangs, dozens of rap songs. By the way, the gang expert doesn't know about rap music, but he tells the jury. I'm just going to interrupt you there because you've reserved a minute. We want to make sure to leave time for the government, so why don't you hold that thought. We'll see you again, and let's hear from Attorney Finkel, AUSA Finkel. Thank you, Your Honor, and may it please the Court. My name is Ryan Finkel. I'm an AUSA in the Southern District of New York. I represent the government on this appeal, as I did in the proceedings below before Judge Stein in this case. It was not an abuse of discretion for Judge Stein to permit the government to offer a limited amount of evidence about gang lingo and gang structure because it was relevant evidence that spoke to, as Judge Lynch was referring to, the motive for this crime. Sarah, I mean, on that point, the sort of missing link is this idea that what Oriana was saying was in any way geared towards the defendants here. I mean, the fact that kind of glaring absence of he's not calling out a particular gang, he's not calling out – I mean, I think there is some reference to individuals, not the defendants here or people who are identified. And so this idea that this is a diss to gangs and that's what motivated it to defendants, when it's not addressed to anyone. It's just very – the link seems missing. I mean, you could speculate, okay, maybe that is what it's – they're the ones who heard it and were targeted and may know something that we don't. But to have something where even the expert is saying, yeah, I don't really know who it's – it can be offensive to gangs. So a few points to respond to that. One, the government didn't seek to elicit. In fact, Judge Stein confirmed that the government would not seek to elicit, that the expert was saying Darius Christopher and Robert Wade were members of a gang. He didn't know them. He was just opining on certain lingo and the structure of a gang use so that the jury can make inferences, if the jury chose to, about whether or not they were gang members. To answer the next point Your Honor raised, Marco Rolano's video, the government argued that that video, which was streamed live on Facebook, approximately four hours before the shooting took place, on the same street corner, right across the street corner, of where the shooting occurred. And in that video, which is, I believe, four minutes and 57 seconds long, the first four minutes or so are him singing along to the song. The last 40 seconds or so are him making a series of lewd gestures, giving the middle finger. This is broadcast live on Facebook, saying, fuck all the dead ops, F you to this person, F you to that person, we out here, we out here. He says, one by one, two by two. He then flips the camera on the video to show, so it's not just a point of view, to show what he's looking at. He sees other people coming. He calls out other people, his friends. He says, gang, one by one, two by two. He's announcing their presence on the street corner. He doesn't have to call out Robert Wade or Darius Christopher. They argued quite extensively to the jury that, exactly Your Honor's point, the jury should reject this evidence. There's no evidence that Robert Wade or Darius Christopher saw this video. There's no evidence that this video was aimed at them. The jury didn't buy it. And I understand why the jury didn't buy it, because the timing of the video, the fact that Darius Christopher and Robert Wade, we argued, were members of the Mackballers who would see this boasting on a particular street corner, which, by the way, was a street corner that they lived nowhere near, so it gives explanation to why they traveled across the Bronx to walk down the block, around the corner, fire on the street of unknown people, it would seem unknown people to them, we gave that reason, and then escape in a getaway car before they went right back home. And so this gives context not just to the motive, which provides context for the substantive charges, but also explains the nature of the relationship between Darius Christopher and Robert Wade. So can I just jump in there? Yes. Again, just to make sure I'm understanding your argument, all of these arguments of yours about how this goes to show motive, this all goes to the only claim that your opponent has raised, which is the admissibility, that it's probative because it shows what a possible motive is. It shows what was going on at the street corner, why anybody would want to shoot at Mr. Oriana or other people at this particular location at this particular time, and that, in your view, tell me if I'm wrong, any link that was, say, missing from the expert testimony between Mr. Wade and Christopher specifically and the shooting is the one that would be made up by your other evidence, you know, the fact that they walked there, they were the people who showed up and shot there. But the absence of a link to the gang testimony would go towards, I guess, what Judge Lentz referred to as a sufficiency claim, an insufficiency evidence claim, which has not been advanced. The only objection here is whether it's admissible. And considering that there is no dispute, Mr. Oriana was there, did make the video, he is one of the guys who got shot, it would certainly be admissible to show what was going on at that moment, and whether the jury then thinks it's enough to put the shooting on Mr. Wade and Mr. Christopher is dependent on all the evidence that comes in. But at least in terms of the admissibility, to show what was literally going on at the, you know, in the hours that preceded the shooting was eminently reasonable to admit. It was not an abuse of discretion to admit that. Is that sort of the gist of your argument here? Am I capturing part of it, maybe? Yes, and I think I'd expand on it in a few ways. The first is, to Your Honor's point, Judge Stein performed his gatekeeping function over this expert evidence and, in fact, ensured that the government did not turn this into a whole history of gangs. He limited it to the mackball or evidence that was found in Darius Christopher and Robert Wade's social media accounts and posts, including evidence that a lay juror would not understand. I, at the time of this trial, had been a prosecutor for five years. I had never known any UOC outside of Star Wars. And certainly a lay juror is not going to understand that either. Judge Stein didn't understand that. And that's what it was limited to. And so the government used that evidence to argue about motive. But to Your Honor's point, the government's evidence was way more than motive, significantly more. With respect to Darius Christopher, Darius Christopher admitted in a post-arrest interview that he was the individual in the video who wore this G-Star sweatshirt. That individual in the video with the G-Star sweatshirt can be seen on surveillance video being dropped off with Robert Wade at the north end of Ryer Avenue, walking south. As he walks south, he takes out from his left pocket, which he told Detective Tolan he was a lefty, a gun and racks it. He then puts the gun back into his pocket. When you say a gun, something that a reasonable juror looking very hard and watching this many, many times could think could be a gun, right? It's an inference that is made. You're not telling me that out of his pocket he pulls a thing, and there it is, a gun. He pulls out of his pocket something black, the kind of thing that people have been shot by police for pulling out of their pocket, and then it turns out not to be a gun. But he pulls something black. He makes a motion which is consistent with possibly that that is a gun, and he is racking the shell into the firing chamber. But, I mean, that is an inference, right? I mean, you're telling me that you can just look at that and say, oh, boy, he's got a gun. I would tell you that, Your Honor. I mean, that certainly was my view when I first saw the video and sort of, you know, just my own version. It doesn't explain what the gesture is. It doesn't make any other sense. I mean, it was argued to the jury that it wasn't a gun. Exactly. It's a jury question. Right. And to just sort of put the pieces of Your Honor's specific point, he reached into his left pocket, racked it, right? It was argued to the jury that that was his phone. He doesn't look down at his phone, his gun. It didn't light up like a phone does. In fact, there was another video. It is something that a reasonable juror could have found to be a gun. Yes, absolutely. That's probably all you need. It's just that, you know, fairly, fairly enough, when the government summarizes the evidence in the light most favorable to the government, it reads one way. When you actually look at the photograph, it was quite reasonable for the defense to argue to the jury that that's not what it was. The jury evidently found that it was, and that's probably all we need to say about the subject. But it's just, you know, sometimes when you hear the thing besides starkly, it sounds like, my God, he just pulled a gun out of his pocket, obviously, et cetera. It's not. It's a closer call than that. Well, it was tried. And to Your Honor's point, the jury rejected it. And, you know, amongst all the other evidence, and, you know, I know the Court has available those videos, they do appear to be guns. And certainly they're not – that's not being challenged. Those videos have been looked at quite a lot by the Court. I appreciate that, Your Honor. Your Honor, in my closing minute, I would just note that while we rest on our papers with the other issues, the Second Circuit has upheld the type of evidence that has been introduced at this trial below. Judge Stein certainly did not abuse his discretion. He actually tabbed in what the government was able to offer. And in any event, if there is any error there, and we certainly don't believe there is, any such error would be harmless. Unless the Court has any other questions, we'll rest on our submission. Okay. Thank you. All right. Thank you very much. Mr. Healy, you've got one minute. Two quick things. First, and I don't want to belabor it, when the government offers the gang expert as motive evidence, it's 404B evidence, that has to undergo a 403 balancing test. Our argument was not that it was inadmissible. It was that it was more prejudicial than probative. Put the gangs on trial. Gang members have guns. Therefore, that black object must be a gun. I do want to spend a quick minute, because I think it is important for the state of criminal prosecution and defense. Judge Stein imposed a 3C1.1 enhancement for obstruction of justice. The sole reason — But you didn't contest. There were two reasons for it, right? You didn't contest one. No. In fact, I would suggest that this, quote, second reason, which was the statement made to the police officers that he didn't know Mr. Wade, fell under the application notes of 3C1.1, I believe it's note six, which is when you make an unsworn statement to a law enforcement officer — Did you argue this, though? In your blue brief is the question. It was not raised, Your Honor, because — So how do you contest it if you didn't argue it to us? If he imposed it on two bases, you argue one was wrong, you can't come in here and say, well, I didn't raise the other one because it was so obviously wrong I didn't need to tell you. It was discussed and it was objected to at the sentencing hearing. I'm talking about your blue brief. Your Honor, I believe we did not. I believe we did refer to the fact that probation agreed with — Who cares about probation? Probation didn't decide this. The judge decided it. You don't tell us — You don't come in here and say reverse the district judge because he did something that a probation officer didn't recommend. I'm talking about did you argue it in the blue brief? Because if you didn't, then what are you arguing here? If Your Honor is referring to Judge Stein's statement, well, I remember that it was a combination of things as his resting and then analyzing it on two — So you're saying that you didn't have to argue it to us because Judge Stein didn't rely on it in the first place? His factual finding was only with respect to the GSTAR selection. You're saying Judge Stein did not impose an obstruction enhancement in part because of that? I would suggest not based on his language and based on his factual finding. So that's why you didn't even need to raise it because it never happened? You didn't need to complain about Judge Stein doing it because he didn't do it. You obviously only have to object to things that the district court did. I objected. We objected to his factual finding and his application of that finding to — Okay. We have your argument, I think, unless there are any further questions. Okay. Thank you very much, both counsel. We appreciate your arguments, and we will take the case under a —